JOHNSTON, REVENUE AGENT, *v.* JACKSON OIL REFINING CO.

[66 South. 777.]

LICENSES. *Cotton seed oil mills. Determination of amount.*

Under laws 1912, chapter 99, imposing a privilege tax on cotton seed oil mills, varying the amount with the tonnage capacity of the mill, and requiring all applicants to state under oath, the capacity of the mill, and also, the number and capacity of each hydraulic oil press installed, the oil mill must pay on the full capacity of its mill, whether it may or may not be used, but it is not required to pay on the capacity of the hydraulic presses alone, if it appears that the other instrumentalities cannot furnish enough material to cause the presses to be run at their full capacity.

APPEAL from the circuit court of Hinds county.
HON. W. A. HENRY, Judge.

Suit by J. C. Johnston, revenue agent, against the
Jackson Oil & Refining Company. From an order sus-
taining a demurrer to the declaration, plaintiff appeals.

The facts are fully stated in the opinion of the court.

*Jas. R. McDowell,* for appellant.

*Green & Green* and *Hirsh, Dent & Landau,* for appellee.

COOK, J., delivered the opinion of the court.

The state revenue agent filed this suit against the
Jackson Oil & Refining Company to recover alleged un-
paid privilege taxes. The declaration avers that the de-
fendant paid less than the taxes levied by chapter 99,
Laws of 1912, on cotton seed oil mills, for the years 1912,
1913, and 1914; that defendant should have paid three
hundred and fifty dollars per year for each of said years,
whereas it had paid only two hundred and fifty dollars
per year. The declaration proceeds upon the theory that
the capacity of the mill must be determined, and is fixed,
by the "number and capacity of each hydraulic press in-
stalled," or, to speak more accurately, that is the con-
struction of the statute which counsel for appellant in-
sists upon. In other words, we understand that the reve-
nue agent seeks to recover because the oil mill has a ca-
pacity, measured by the capacity of the hydraulic presses
installed in its mill, of one hundred tons, whereas it had
paid only on a capacity of eighty tons. A demurrer to
the declaration was sustained by the trial court, and the
revenue agent appeals:

We have stated the position or contention of the reve-
nue agent, and will now state the contention of appellee.
One of appellee's counsel insists that the statute imposes
a privilege on the capacity of the mill actually employed
in the business; that the privilege is not levied on the

unemployed capacity of the mill. We understand this contention of appellee to be, conceding that the mill in question had an equipment by which is could have crushed and manufactured one hundred tons, it was nevertheless only required to pay on that portion of its potential capacity which it actually employed.

We do not believe that either of the above-mentioned contentions is sound. The capacity of the mill cannot be arbitrarily determined and fixed by the capacity of the "hydraulic presses installed," and such was not the purpose of the legislature. If the actual capacity of the entire instrumentalities of the mill was less than one hundrd tons, it was not the intention of the legislature to levy a tax measured alone by the capacity of one of the instrumentalities, to wit, "the capacity of the hydraulic presses installed." It is easily conceivable that an oil mill might install presses with a combined capacity to take care of two hundred tons of seed per day of twenty-four hours; whereas the mill, by the employment of all its other facilities, could not possibly crush more than one hundred tons per day. On the other hand, it seems to us that the measure of capacity must not be determined by the actual amount of the output of the mill. Privilege taxes are collected in advance, and it would be impossible to foretell the prospective actual output of a mill. It was doubtless the intention of the legislature to fix the amount to be paid by the potential capacity of the mill, taken as a whole, and the applicant for privilege license is required to make oath of "the number and capacity of each hydraulic oil press installed," in order that the officers upon whom is imposed the duty to see that all applicants for license shall pay the amount imposed by law may have data from which they may check up the licenses. If it should appear that an oil mill had installed oil presses of a capacity greater than the applicant had paid license for, this would naturally call for an investigation.

One of the appellee's counsel, in our opinion, takes the correct view of the meaning of the statute. We quote from brief as follows:

"In fine, it is a condition precedent to the accurate understanding of this section to note that the capacity of the presses is not required to be stated as a predicate for the purpose of an imposition of the tax, but, on the contrary, is required to be given absolutely as an element of information, so that, if, perchance, a false statement is made as to the capacity of the mill, such capacity may truly be determined by an inspection of the return. The tax is upon the business done; not upon that which was left undone by an inability upon the part of the doer to accomplish it. This section is plain and unambiguous. It mentions both the capacity of the mill and the capacity of the hydraulic presses, and makes the capacity of the mill the basis upon which the party is to be taxed, and this appellee has paid its taxes upon its actual capacity of its mill; has paid upon what it has done. Is it now to be made to pay upon what it left undone by reason of not being able to do it? It would not be just to tax a business upon an amount which could not be done; that is to say, if, as stated by the court below, there was a gin that had a capacity of one hundred bales per day, but this was connected with a boiler that had a capacity of only twenty bales per day, the capacity of that gin would not be one hundred bales, but would be twenty bales. Yet the boiler is just as much a part of the mill as is the press, and each must co-operate in the production of the output."

It was certainly not the intention of the legislature to levy privilege licenses upon oil mills upon an unjust and unreasonable basis. The provision of the statute in question is somewhat obscure, but we must give it some meaning, if that may be done reasonably, and without violence to the language employed. The above quo-

tation from brief of counsel expresses our views of the meaning of the statute.

The oil mill must pay on the full capacity of its mill, whether it may or may not be used, but it is not required to pay on the capacity of the hydraulic presses alone, if it appears that the other instrumentalities, run at their full capacity, cannot furnish enough material to cause the presses to be run at their full capacity.

*Affirmed.*